IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
SPARTANBURG DIVISION

UNITED STATES OF AMERICA

v.

DA RON JEROME COLLINS

CRIMINAL NO: 7:23-00900-TMC

## GOVERNMENT'S MOTION AND MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR UPWARD VARIANCE

The United States of America, by and through its undersigned attorney, in accordance with 18 U.S.C. § 3553(a) and the United States Sentencing Guidelines ("USSG"), hereby moves the Court to impose an upward variance at sentencing. Defendant Da Ron Jerome Collins pled guilty to witness tampering, in violation of 18 U.S.C. § 1512(b)(3), and obstruction of justice, in violation of 18 U.S.C. § 1519. The advisory Guidelines range of 37-46 months is woefully inadequate to satisfy the purposes of sentencing. The statutory maximum for each offense is 20 years. § 1512(b)(3); § 1519. Based on the nature and circumstances of the offenses and the defendant's history and characteristics, an upward variance to 240 months' imprisonment is necessary to reflect the seriousness of the offense, to promote respect for the law, to provide just punishment and to protect the public from further crimes of the defendant.

## I.    The Offense Conduct[1]

### A.    Underlying Offense—Collins assaults and strangles Young.

On Saturday, May 13, 2023, at about 9:36 p.m., Collins' 23-year-old daughter, Iniesha Collins ("Iniesha"), placed an anonymous 911 call to report that "there was a lot going on in the

---

[1] At sentencing, the Government intends to offer exhibits including portions of audio and video recordings (not attached hereto and previously provided in discovery) relevant to its objections to the presentence report and to this Motion.

house…an assault or domestic abuse," that Collins and his girlfriend Casey Young were in the house, and "it sounds like somebody is choking…I just need you guys to get here fast." PSR, ¶¶ 7-12. Iniesha told the operator that her father and his girlfriend were in the house. At the time, Collins, age 47, his girlfriend of two years, Casey Young, age 44, Young's teenage son and Iniesha lived on Pratt Drive in Boiling Springs, South Carolina.

When Spartanburg County Sheriff's Office (SCSO) deputies arrived, their body-worn cameras captured the condition of the house. The deputies observed the house was torn apart with clothes and other household items strewn about the house, which Iniesha indicated was caused by the couple's fighting. PSR, ¶ 10. Collins told the deputies that he owned the house and that he wanted Young, with whom he had been living for eight months, to move out. PSR, ¶ 8. Deputies also observed Young's injuries and asked her whether Collins "put his hands on [her]." Young stated, *"you see it don't you … can't you see my neck,"* as she pointed to the pressure marks and bruises around her neck and chest and a scrape on her elbow. Young also told the officers that Collins tore her shirt as he dragged her down the stairs and out the front door. PSR, ¶ 12. Collins denied that he "choked" Young but admitted that he threw her and her clothes out of the house and tackled her to keep her from breaking a kitchen window. PSR, ¶ 8. At the time of the incident, Young wore braided hair extensions. Deputies found one of her braids in the backyard (PSR, ¶ 8) which indicates a struggle had taken place. The residence was equipped with an ADT security system that included door sensors and (1) a backdoor camera, (2) a front doorbell camera, (3) a street-facing above-garage ("driveway") camera and (4) one indoor hallway security camera. PSR, ¶¶ 36, 40. When asked for security camera footage, Collins immediately responded, telling police that no footage was available because his internet service was down. PSR, ¶ 9.

Even though Collins had assaulted and strangled her, Young told the deputies that she did

not want Collins to be arrested and that "[she] just want[ed] the night to be over." Officer Blackwell BWC, Timestamp 12:44. Despite her visible injuries, her statements to police implicating Collins, and Iniesha's 911 call reporting that Young was being "choked," Collins was not charged. According to police, Collins was not arrested because he had no criminal history, the parties provided inconsistent stories and Young was uncooperative.[2] *See* PSR, ¶ 12. Both Iniesha (PSR, ¶ 36) and a neighbor ("Neighbor #1") later reported that after deputies left the residence on May 13, the couple continued to fight. Neighbor #1 reported that she saw Collins push and shove Young against the window in an upstairs bedroom. According to Iniesha, the couple remained in separate rooms and did not interact or speak to each other through the rest of the weekend. Young called Teresa Springer to tell her about the incident and to let her know that she would not make it to church the following day, which was Mother's Day. Springer is grandmother to Young's children.

## B.     Young's last day.

On Monday, May 15, 2023, Collins was employed by a concrete company with cement plants in Greenville and in Gray Court, South Carolina. According to cell phone location data, Collins left his residence at approximately 4:24 a.m. headed to the Gray Court plant.[3] At approximately 2:55 p.m., he returned home. The activity log shows the defendant established a remote connection to his home security cameras via the mobile app as he left the house. Young

---

[2] A fair assessment of the evidence shows there was at least probable cause to arrest Collins for criminal domestic violence. At a minimum, a person commits second degree criminal domestic violence if he causes physical harm or injury to a person's own household member; or attempts to cause physical harm or injury to a person's own household member with apparent present ability under circumstances reasonably creating fear of imminent peril in violation of under S.C. Code § 16-25-20 (A) and, commits third-degree criminal domestic violence under subsection (A), by (d) impeding the victim's breathing or air flow. S.C. Code Ann. § 16-25-20(C)(2023).

[3] According to cell phone location data, at approximately 5:30 a.m., he arrived at the plant.

left the residence at approximately 6:00 a.m., and at approximately 8:00 a.m., she clocked in at MGC Diabetes and Endocrinology at Spartanburg Regional Hospital.[4] PSR, ¶ 29.

Between 4:34 a.m. and 3:59 p.m. on May 15, the ADT activity log for Collins' driveway camera detected a person within its frame and was triggered to record 22 times.[5] However, when ADT searched the defendant's account for video images recorded by the camera during that period, only 11 images were recovered. Between 12:12 p.m. and 2:34 p.m., the camera was triggered to record 12 times, however, only 11 video images were recovered. On the images recovered no person was captured, which indicates the camera was triggered by wind, a small animal or some other natural element.[6] The recovery of 11 video images recorded around midday shows: (1) the backyard and driveway cameras were operable throughout the day except for the periods when Collins temporarily paused recording or intentionally disabled the recording feature on his cameras and (2) video images relevant to the investigation were recorded throughout the day and deleted by the customer as confirmed by ADT.

---

[4] On her way to work, she stopped at Springer's residence, and at 7:40 a.m., bought a drink at Starbucks Coffee using her debit card. PSR, ¶ 26.

[5] Pursuant to search warrants, ADT produced an activity log which showed the camera activity and 452 video images created between May 13-21, 2023, for the defendant's account. According to ADT, his system is set to record 30-second video images which remain available on their servers until the size limit has been reached *or the customer deletes it*. Once a customer deletes a video, it is not recoverable by ADT from its servers. The customer controls the placement of cameras and sensors, including the configuration of video analytics rules to control when and what motion or activity triggers a camera to record. Collins accessed and controlled his account via a mobile app on his cell phone to receive alerts by email or push notification of images captured by his cameras, pause or temporarily disable recording and to delete recorded images.

[6] According to the activity log, the driveway camera was triggered to record the missing video [clip #9 of 12] at 2:01 p.m., on detection of a person within its frame. Iniesha told police that she took an Uber ride to her job in Gaffney, South Carolina at approximately 2:00 p.m., therefore, it is likely that her movement triggered the camera. She told police that she spoke with Young around 2:30 p.m. and Young agreed to pick her up from her job at 11:00 p.m. when her shift ended. *See* PSR, ¶ 22.

At 3:57 p.m., Young clocked out and at approximately 4:00 p.m., a Flock highway camera captured her white Infinity as she drove home. Cell phone service provider records show that at approximately 4:09 p.m., her cell phone connected to a cellular tower near the hospital to make a call to Springer. PSR, ¶ 13.



*Figure 1*

From approximately 4:20 p.m. to 4:37 p.m., Ace Hardware surveillance cameras captured Young as she pulled into the parking lot and entered the store. *Figure 2,3*. Using her debit card, she ordered and paid for duplicate house keys to prevent Collins from locking her out of the house. PSR, ¶¶ 27, 32. She held her phone to her ear as she paid for the keys with her debit card. *Figure 3*. At approximately 4:32 p.m., Young's phone connected to a tower near her residence to call her son's teacher and to contact Springer again. At 4:39 p.m., records show an outgoing text message to Springer, which was the last user-initiated activity over Young's cell phone. At approximately 4:44 p.m., a store camera captured Young as she pulled out of the parking lot and headed home. *Figure 4*.



*Figure 2*

 

Figure 3                                    Figure 4

According to the ADT log and cell phone location data, at approximately 2:55 p.m. Collins arrived home. He was home alone. At 3:03 p.m., the log shows the driveway camera was triggered by its detection of a person, however, no video image was recovered by ADT.[7] At approximately 4:51 p.m., a next-door neighbor's ("Neighbor #2") camera captured Young's vehicle as she arrived home as shown in *Figure 5*. PSR, ¶ 43. Before she arrived, Collins moved his car from its original position against the garage door to the middle of the driveway. *Id*. Because his black Infinity blocked her access to her parking space in the driveway, Young parked on the street in front of the house. PSR, ¶¶ 24, 43. Iniesha and Neighbor #1 confirmed the normal parking configuration for Collins' vehicle, Young's vehicle and Collins' employer's truck, which he always parked on the street, as shown in *Figure 6*. PSR, ¶¶ 22-24, ¶ 55.

 

Figure 5                                    Figure 6

---

[7] In the hours after he got home from work, from 2:41 p.m. to 3:49 p.m., the driveway camera was triggered to record on detection of a person six times, however, ADT recovered no video images from their server.

Figures 7 and 8 show the location and frame of the driveway camera.

 

*Figure 7*                                                                 *Figure 8*

At about 5:24 p.m., a camera attached to an across-the-street neighbor's ("Neighbor #3") house captured Collins, wearing bright-colored athletic shorts and a light-colored t-shirt (*Figure 9*), as he rummaged through the trunk of Young's car. Young's arrival (*Figure 5*), the movements of the cars between 5:01 p.m. and 5:50 p.m., and the defendant's rummaging through the trunk of her car (*Figure 9*) all occurred within the frame of his driveway camera. Even though these movements were captured by two different neighbors' cameras, the activity log for the defendant's driveway camera shows no camera activity between approximately 3:59 p.m. and 8:33 p.m.



*Figure 9*

Young does not appear in any the video images outside of the residence. This is consistent with

the camera's recording function being intentionally paused or disabled.

According to T-Mobile records, the last user-initiated activity on Young's cell phone, which has not been found, occurred at approximately 4:39 p.m. before she arrived home. From approximately 6:32 p.m. to 6:58 p.m., during a data session, her phone connected to a cell tower located approximately 1.5 miles from her residence on Baby Road.[8] Thereafter, all cell tower connectivity permanently ceased which caused incoming calls to be routed to voicemail and text messages to go undelivered. A phone that is powered off, has no battery life or is destroyed cannot establish or maintain a connection with a cell tower, making it difficult to track or locate. T-Mobile terminated phone service for non-payment within a few weeks. Young has not been seen on camera or in person nor has she been heard from since she was home alone with the defendant beginning at approximately 4:51 p.m. on May 15.

### C.      Collins dumps Young's car.

The ADT activity log shows that at approximately 7:20 p.m., Collins exited his residence. Thereafter, he drove Young's car to an apartment complex. Surveillance cameras positioned along the three-mile route captured him at various points as he drove past public buildings and into the apartment complex lot from approximately 7:25 p.m. to 7:35 p.m.[9] Once he entered the parking lot, he backed the car into an end-of-the-row parking space next to a cluster of mature shrubs *(Figures 10, 11)* which obscured the car and its license plate. At approximately 7:38 p.m., Collins

---

[8] A data session on a cell phone refers to the time a device is actively connected to the cellular network for transferring data, like browsing the web, streaming videos, or using mobile apps. In the context of a cell phone's data usage, "active" and "passive" data sessions refer to how data is transferred and used. Active data sessions involve a direct, user-initiated request for data, while passive data sessions occur in the background, without direct user input. It is unknown whether this data session on Young's phone was active or passive.

[9] The timestamp on the apartment complex surveillance camera is approximately 10 minutes ahead of the actual time. The image in *Figure 11* was taken on May 18 when the vehicle was found.

wiped down the interior surfaces, emerged from the car and locked its doors. Unlike a couple hours earlier, he was wearing a dark colored sweatshirt, long pants, a baseball cap and gloves. *Figure 10*. From approximately 7:38 p.m. to 8:21 p.m., Collins exited the parking lot and walked the back to his residence. *Figures 12, 13, 14*.


*Figure 10*


*Figure 11*


*Figure 12*


*Figure 13*


*Figure 14*

Collins left his phone at home while he drove to the apartment complex to dump Young's car. Therefore, the location data for his cell phone makes it *appear* as if he did not leave his home. The ADT log shows no interior sensor activity nor exterior camera activity from approximately 7:20 p.m. to approximately 8:21 p.m., the time it took him to exit his residence, drive to the complex, dump the car, walk home and enter the house. The absence of activity during this 62-minute period indicates recording for his driveway and backyard cameras were intentionally paused or disabled.[10]

Phone records show a missed call from Iniesha to Young at approximately 10:19 p.m., which was routed to voicemail. When Iniesha could not reach her, she feared Young would not pick her up at 11:00 p.m. and that she would be stranded in Gaffney.[11] At approximately 12:08 a.m., Iniesha arrived home. Iniesha and two of Collins' neighbors noticed that Young's car was missing, that Collins' work truck was backed up to the garage door in the driveway and that his car was parked in front of the truck *(Figure 15)*, which was abnormal.[12] PSR, ¶¶ 22, 23. There is no known employment purpose that explains the positioning of the truck.

---

[10] After he returned from dumping the car, the backyard camera was triggered on motion of a person at 8:33 p.m. and 9:26 p.m. At 8:44 p.m., and at 9:36 p.m., the driveway camera was triggered to record. However, no video images for either camera were recovered by ADT.

[11] Iniesha called Collins for a ride six times. PSR, ¶ 39. He did not answer her calls, so she was forced to order an Uber ride home. PSR, ¶ 22. When she got home, Collins was up and fully dressed. PSR, ¶ 39. He offered no explanation for why he did not answer her calls.

[12] The activity log recorded the overhead garage door was opened at 9:04 p.m.



*Figure 15*

According to cell phone location data, at approximately 12:19 a.m., Collins left his residence in his work truck. Iniesha's arrival, the positioning of the vehicles in the driveway and Collins' departure did not trigger the driveway camera to record, which indicates he intentionally paused or disabled the recording function. According to surveillance video and cell phone location data, from 12:19 a.m. to 3:00 a.m., Collins inexplicably drove around in Greenville and Laurens counties including to areas in and around his employer's Greenville and Grey Court cement plants. PSR, ¶¶ 51-53. A forensic examination of his phone shows that from approximately 2:17 a.m. to 2:51 a.m., he powered his cell phone off for approximately thirty-four minutes, which prevented the continuous collection of location data during his midnight drive. PSR, ¶ 56. His phone was located at the Gray Court plant from approximately 3:00 a.m. to 9:52 a.m. when he drove home to meet police. There is no employment purpose that explains the defendant's after-midnight drive.

### D.     Collins lies and continues to obstruct the investigation.

On Tuesday, May 16, at approximately 8:00 a.m., when Young failed to stop by Springer's house on her way to work, Springer began calling her phone. At approximately 9:13 a.m., an hour and thirteen minutes after she was scheduled to report to work, her manager called 911 to request a welfare check. Springer and Young's children headed to the defendant's residence to meet the

11

police and file a missing person report. While she waited for police to arrive, Springer spoke to Collins by phone and asked him whether he knew Young's whereabouts. Springer reported that Collins was dismissive and told her Young did not come home from work the previous day and that he had not seen her. PSR, ¶ 16. Approximately thirty minutes after telling Springer that Young did not come from work, Collins made the first of nine calls to her phone between 9:29 a.m. and 11:32 a.m.[13]

At approximately 9:44 a.m., two uniformed deputies arrived at the couple's residence. The encounter was recorded by the deputies' body-worn cameras. Even though Collins told deputies he got home around 2:00 p.m. phone location records show he arrived home at approximately 2:55 p.m. on May 15. He admitted that he and Young were not getting along and barely spoke to each other. He stated that Young got home around 5:00 p.m., and the two had a brief exchange during which he made a vulgar remark.[14] Even though phone location data indicates otherwise, Collins told police that Young took a shower, and changed clothes, and then he lied, telling them that she left the residence in her vehicle about an hour after she arrived.[15] Collins then volunteered a

---

[13] He sent ten text messages to her phone from 5:34 a.m., while he was at the Gray Court jobsite, to 8:24 p.m. on May 16-17. In his first message, Collins introduced his narrative that Young did not come home Monday night and that she had run off with another man: *"That must be some good d---- since you didn't show your face last. I want all your shit out my house ASAP, you could stay where you['re] at[.]"* He received no response to any of his messages so, presumably to show only that he had attempted to reach Young, Collins forwarded the text messages to Young's daughter. He made no calls and sent no messages to her phone after May 17.

[14] Collins claimed that Young walked into the house carrying roses, which she said were a gift from her new boyfriend. PSR, ¶ 20. He then repeated the crude remark he made to Young regarding female genitalia to remind her that she was not the only woman on the planet. The day before Young went missing was Mother's Day Sunday. Her son gifted her a floral arrangement, which she picked up from Springer's house Monday morning. PSR, ¶ 16.

[15] Collins knew that no images from his camera would be recovered, however, he could not know what activity was captured and preserved by his neighbors' security cameras.

description of Young's vehicle. When the deputies asked to see security camera footage from the previous day, Collins stated that no images were captured by the doorbell camera because he disabled the camera Monday morning to allow contractors to install a storm door. After checking the ADT app on his cell phone for video images from the previous day, Collins walked into the garage and, out of the deputy's view, he located the power cord for the driveway camera. He then informed the deputy that the camera had been unplugged, so all previously recorded images were wiped out. Collins also told police that Young, *at some unknown time*, must have dislodged the power cord when she moved her personal items and furnishings into the garage. Investigators who examined the condition of the plug and the outlet determined that the plug was not damaged, and that it would be difficult to dislodge the plug from the outlet.[16] PSR, ¶ 35.

Realizing that his story did not align with the facts as she knew them, Springer reminded Collins that minutes earlier during their phone conversation, he told *her* that Young did not come home from work Monday, and that he had not seen her. PSR, ¶ 16. Collins chose to deflect instead of answering Springer's question directly, exclaiming, *"she and I doesn't [sic] speak."* He then repeated the vulgar remark he made to Young. Having been caught in a lie by Springer, Collins told her no video footage of Young at the house was available, because the driveway camera had been accidentally unplugged. He admitted that he solely controlled the cameras and, despite his claim that the driveway camera was accidentally unplugged, "[his] cameras are always on, and [he] sees everything." At the end of the interview, Collins consented to a search of the residence.

---

[16] The activity log shows no loss of power to the driveway camera, which was triggered to record a total of 25 times on May 15. Except for a pause of the recording from 3:59 p.m. to 8:33 p.m., the camera operated throughout the day. The recovery of video images recorded around midday shows that even if the camera was unplugged, previously recorded images were recoverable. Furthermore, *after* Young disappeared, the driveway camera was triggered twice—at 8:44 p.m. and 9:36 p.m.—to record which indicates it was not disconnected from its power source.

Not only was Young not found in the house, but her furnishings, a television, her clothing and her son's clothing and other personal belongings had been moved to the garage. PSR, ¶ 21.

On Wednesday, May 17, SCSO Violent Crime investigators recorded an interview with Collins. He told investigators that when Young arrived home around 5:00 p.m. on Monday, she took a shower and left about an hour later. He again described their brief exchange, repeated his crude remark and stated, *"it was . . . mute... it was mute...there was no conversation."* Collins then lied, telling police that Young walked out of the house and drove off in her car. Knowing that he left his cell phone at home and that its location data would show that it never left the house, he lied again when he volunteered, *"I spent the evening throwing her belongings into the garage..."* and that *"I did not leave the house."* Collins again stated that all footage captured by the driveway camera before it was unplugged was wiped out and could not be recovered.[17] This time he stated that *he* must have accidentally unplugged the driveway camera when he threw Young's belongings into the garage.

This time he painted a rosey picture of his relationship with Young, professed his love for her and talked about their plan to vacation in New Orleans over the Memorial Day holiday.[18] Knowing that he had dumped Young's car two days earlier, he provided investigators a description of the car and stated, *"... so my question is there anyway ya'll can just track the vehicle to find where she's at?"* At no time did he suggest that investigators track the location of her cell phone

---

[17] His claim is belied by the recovery of 11 video images recorded around midday before he claimed the camera was unplugged. It also fails to explain the absence of footage of other activity known to have occurred within the frame of the camera *before* it was allegedly unplugged.

[18] Collins does not dispute that at the time of Young's disappearance, he was involved in a monthslong sexual relationship with a female co-worker. PSR, ¶ 57. In text messages exchanged between Collins and the woman a week after Young disappeared, he asked her to meet him for "a quickie [sex]." A forensic analysis of his phone shows he was a frequent user of dating apps.

to find Young.

His house of cards came tumbling down the next day. On May 18, investigators found Young's car in the apartment complex parking lot and recovered surveillance camera footage from the complex management staff. While cell phone location data shows *his phone* was located at his residence on Monday from 2:55 p.m. until after midnight, the surveillance cameras along the route to the apartment complex and the ADT log show that from 7:20 p.m. to 8:21 p.m., Collins left his house to dump the car. Once the locksmith unlocked the car, police found Young's purse, her checkbook, bank cards, medication, house keys and a cell phone charger. After police recovered the apartment complex surveillance footage, Collins declined to speak with investigators.

### D.     Collins' admissions.

Collins was arrested on federal charges on November 15, 2023.[19] At the time of his arrest, the Government moved for detention pending trial. He temporarily waived his right to a detention hearing with leave to revisit bail in the future. On June 20, 2024, a cooperating witness ("CW") housed with Collins at the Anderson City Jail reported to police that he had information concerning the Collins case. The CW stated that during one of his conversations with Collins, the CW insinuated that Collins had shot Young, because the Bureau of Alcohol, Tobacco, Firearms and

---

[19] On June 1, 2023, Collins was arrested on outstanding warrants from Spartanburg County for grand larceny, in violation of South Carolina Code § 16-13-30 (2019) and obstruction of justice, in violation of § 16-9-340 (2022), each of which carries a maximum sentence of 10 years' imprisonment. On June 6, 2023, bond was set at $9,000 with home detention and GPS location monitoring. As a condition of bond, Collins was also prohibited from possessing a firearm and from leaving the state without the court's permission. On or about June 29, 2023, his bond was revoked when he was found in possession of a loaded AR-15 rifle, additional magazines, various ammunition, a Kevlar vest, an armored helmet, and other tactical gear. On September 20, 2023, his bond was reinstated. On or about September 24, 2023, Collins traveled to Virginia without permission from the court. On October 11, 2023, after a bond revocation hearing, his bond was modified to reinstate GPS monitoring.

Explosives (ATF) was involved in Collins' case. According to the CW, Collins denied that he killed Young *with* a firearm, but he did not deny that he was responsible for Young's disappearance and death. The CW also stated that Collins was not concerned that he would be charged with killing Young because, as Collins put it, "[investigators] will never find her [Young]" and even if they did, they would "not be able to prove that he [Collins] had anything to do with it [her death]." According to the CW, Collins credited his military training when he expressed confidence that investigators would not be able to prove that he killed Young. The CW also recounted a discussion he witnessed involving the CW, Collins and other inmates when Collins expressed his desire to "reach across the table and choke" his first lawyer when she advised him that he was unlikely to be released on bond.[20] The CW stated that Collins continues to be exasperated that he was not granted bail. The Government will call the CW to testify at Collins' sentencing hearing.

Before investigators retrieved video footage from his neighbors or from the apartment complex, Collins appeared to be cooperating with the investigation. He ultimately admitted that he tampered with law enforcement witnesses and concealed evidence to manipulate and hinder the investigation of Young's disappearance. He has offered no inculpatory or exculpatory explanation for why he did so and has offered no credible information regarding Young's whereabouts.

## II.     Argument

### A.     The preponderance of the evidence shows that Collins killed Young and disposed of her body.

To establish a homicide, the Government must prove (1) that the victim is dead, and (2)

---

[20] His apparent fixation with women's throats is unnerving. During a recorded jail call between he and his brother, Collins, after a heated conversation with his daughter, stated that, *"[he] wanted to punch [his daughter] over the fucking phone"* and that . . . *"if [he] were there, [he] would punch her right in her fucking throat."*

that the death was caused by a criminal act—not by accident, suicide, or natural causes—of another. *See United States v. Woods,* 484 F.2d 127, 132 (4th Cir.1973), *cert. denied,* 415 U.S. 979 (1974). While the body itself serves as the best evidence of an unlawful death, recovery of the victim's body is not necessary to prove a homicide. *United States v. Russell*, 971 F.2d 1098, 1110 (4th Cir. 1992) (citing *Virgin Islands v. Harris,* 938 F.2d 401, 408, 411 (3d Cir. 1991)). There are other ways to establish that the person was killed. The evidence presented in this case is sufficient to find, by a preponderance of the evidence, that: (1) Young did not voluntarily disappear from her life—she is dead and (2) Collins killed her. *United States v. Jinwright*, 683 F.3d 471, 484 (4th Cir. 2012) (The "different standards of proof that govern at trial and sentencing" enable the sentencing court to find a fact by a preponderance of the evidence that the jury may not have found beyond a reasonable doubt.).

### 1.   The preponderance of the evidence shows that Young is dead.

Collins' statement to the CW that "they [police] will never find her [Young]" and even if they did, they would "not be able to prove that he [Collins] had anything to do with it [her death]," exemplifies the mistaken belief of many offenders that the longer a victim is presumed missing and not found, the easier they remove themselves from culpability. Collins does not get away with murder because he has successfully disposed of Young's body. All victims have habits, patterns, family and friends. The absence of these patterns—someone missing work or an important milestone—can show conclusively that a person is dead. Over thirty years ago in *Harris*, the Third Circuit noted that in modern society, the inexplicable disappearance of the victim is, itself, circumstantial evidence of the crime or corpus delicti:

> Worldwide communication and travel today are so facile that a jury may properly take into account the unlikelihood that an absent person, in view of his health, habits, disposition and personal relationships would voluntarily flee, "go underground," and remain out of touch with family and friends. The unlikelihood of such a voluntary disappearance is circumstantial evidence entitled to weight

equal to that of bloodstains and concealment of evidence.

938 F.2d at 418 (quoting *Epperly v. Commonwealth*, 224 Va. 214, 228-29 (1982)). Up to the time she vanished, Young was in daily contact with her three children and in regular contact with the rest of her family. Minutes before she got home, she was talking and texting with Springer. She was a devoted and engaged mother (referring to her and her teen son as "a package") going about her normal daily activities. PSR, ¶ 25. Her phone has registered no user-initiated activity nor cell tower connection since she was known to be home alone with the defendant. All attempts by family and friends to reach Young by phone, which was eventually disconnected for non-payment, have failed. She has never gone longer than an hour or two without responding to a text message or phone call from her family. Two days after Young disappeared—May 17—was Young's daughter's birthday. PSR, ¶18. She communicated with her daughter several times a week. *Id.* For the first time since she was old enough to remember, Young's adult daughter did not receive a *"Happy Birthday"* phone call from Young. PSR, ¶18. In the past two years, Young has missed many more milestones, family celebrations and all the mundane moments that happen in the middle.

Young rarely missed a day of work at Spartanburg Regional Hospital, her only source of income. She has not returned to her job. There has been no non-automatic bank activity and no cash withdrawal in any of Young's known financial accounts since her May 15 Ace Hardware purchase. PSR, ¶ 26. Because she did not terminate automatic payments for car insurance, a Netflix subscription and commercial storage fees, they drained her bank account of her hard-earned income. Young is without her paid-for car, house and car keys, two purses, checkbook, bank cards, medication, cell phone charger and other personal items. PSR, ¶ 32. Abandoning financial assets (e.g., cash, a bank account, credit or debit card, or a checkbook) or personal records to start a new

18

life makes no sense if she left her life deliberately and voluntarily. An April 2025 credit report shows no inquiry or request for credit, and three accounts have been reported to collections since her disappearance. The report shows no new address associated with Young's social security number and the house on Pratt Drive in Boiling Springs is listed as her current address. Her passport has not been used. The fact that her clothing and her son's clothing, furnishings, and significant personal items were left inside their residence and in a commercial storage unit suggests Young's disappearance was not planned. PSR, ¶¶ 21, 28.

To leave without telling her family and remain out of touch with them is totally out of character for Young. PSR, ¶ 17. Even though their relationship was tumultuous, Young was not prepared to, nor did she plan to, leave Collins or her residence on the day she disappeared. If she did, she had no reason to keep her plans a secret from her family, all of whom encouraged her to leave Collins. During questioning, Collins himself described her as a *"homebody"* and said that …*"if she's not here, [then] she's with her family."* During a recorded interview, Iniesha recalled only one occasion when Young got dressed up and went out with her girlfriends. If she were physically capable, Young would never break her promise to Iniesha and leave her stranded in Gaffney. PSR, ¶¶ 17, 22. Young was not a substance abuser and, before she disappeared, she suffered from no serious injury or illness. The defendant described her to police as "healthy" and "active." No person other than the defendant is known to pose a danger to Young. There was no indication that Young did not intend to keep her personal and professional commitments.

Within a few days of her disappearance, Young's colleagues at the hospital offered a $10,000 reward for information leading to her whereabouts. No tips have been received and no claim has been made for the reward money. To find Young and/or information leading to her whereabouts, police conducted foot searches and checked border crossing databases and other

police agencies, all with negative results. PSR, ¶¶ 51, 53, 56. Law enforcement disseminated a missing person alert to media outlets, issued a BOLO advisory for Young and for her car, and entered all identifying information into license plate recognition platforms, the National Missing and Unidentified Persons ("NameUS") database (a resource created to improve access to information that would help solve missing and unidentified person cases) and the National Crime Information Center ("NCIC") database.[21] Young's body has not been recovered nor has there has been a recovery of a body matching that of Young. Records entered into NCIC are available to more than 100,000 authorized law enforcement and criminal justice agencies nationwide 24 hours a day, 365 days a year. The most recognizable use of the system is by officers during routine traffic stops. The system responds instantly to let officers know, for example, if the driver is wanted or if the vehicle is stolen, to locate missing persons, to find and apprehend fugitives, and to identify terrorists and convicted sexual offenders. None of these efforts has led to police to Young.

Since the missing person report was filed May 15, news releases regarding her disappearance have reached an online and print audience of 6.6 million and a television audience of about 78,000 nationwide. *Critical Mention. (Accessed March 3, 2025). "U.S. v. Da' Ron Collins" dataset, Critical Mention platform.* Young's family and friends created a Facebook page to receive tips from the public regarding her whereabouts. Despite media coverage and the public's awareness of her disappearance, other than the tipster who reported the location of Young's car at the apartment complex two years ago (PSR, ¶ 30), there has been no sighting of Young and no significant lead as to her whereabouts. No one who knows Young—her immediate family, her close friends and her professional colleagues—believe she is alive and well. Because the absence

---

[21] On June 14, 2023, investigators collected DNA from Young's daughter for future analysis.

of evidence of life is evidence of death, they have come to believe and accept that she is deceased.

### 2.  The preponderance of the evidence shows that Collins killed Young.

Unsurprisingly, an increasing number of "no body" homicides involve domestic (husband-wife, boyfriend-girlfriend, parent-child) relationships for which the presence of eyewitnesses is rare. These cases are often built on circumstantial evidence, but "a conviction may rely *entirely* on circumstantial evidence." *United States v. Hassan*, 742 F.3d 104, 139 (4th Cir. 2014) (emphasis added). Murder convictions based on circumstantial evidence have withstood sufficiency of the evidence challenges in cases where the victim's body was not recovered.[22]

---

[22] *See, e.g.*, *Russell*, 971 F.2d at 1110 (conviction of first-degree murder affirmed for killing defendant's wife, an officer in the United States Marine Corps, even though her body wasn't found where evidence showed defendant was unhappy in his marriage and regularly subjected his wife to emotional and physical abuse; his wife was a successful Marine Corps officer and defendant was hostile toward the Marine Corps; prior to wife's disappearance, defendant suggested she might be found dead; he was planning a murder; he believed a shot behind the ear was an effective way to kill a person; he had purchased a pistol two days before his wife disappeared and possessed a homemade silencer; the two were together the last time she was seen or heard from; defendant took steps to ensure his wife's sister would not be present at that time; defendant appeared nervous and agitated when he was seen at his quarters around the time the murder allegedly took place; there was blood on the floor of the storage shed at the couple's quarters at or about the time of her disappearance; although he owned an open-bed pickup truck, defendant borrowed a station wagon and drove to Pennsylvania that same afternoon; he had once remarked that a body could easily be disposed of in a Pennsylvania mine shaft; he thoroughly cleaned and deodorized the borrowed car before returning it, which he had never done before; after his wife's disappearance, he asked a friend how long it would take a body to decompose; an exhaustive search for her body was unsuccessful; her possessions and bank accounts have not been disturbed; and she has not been seen or heard from by her family or friends);

*United States v. Wills*, 346 F.3d 476, 497-99 (4th Cir. 2003) (circumstantial evidence sufficient to find defendant killed the victim even though victim's body was not found and there was no biological evidence where defendant lured a victim away from his home by posting a fake job flier under the victim's door and obtained a cell phone under a fictitious name to call and stage a fake out-of-state job interview with the victim; victim disappeared after telling his family and friends in Virginia that he was going on a job interview for a job advertised in the fliers; victim had not been seen for three days when his car was found in a Maryland apartment complex parking lot; victim gave no indication that he did not intend to return home; he took no personal items with him, very little cash, and had no credit cards, passport, or travel documents; he never returned to his job nor did he pick up his paycheck; phone connected to defendant called victim's phone close in time to victim's disappearance; fellow prisoner testified defendant told him "they'll never find

At sentencing, the Government will present evidence sufficient for the court to find by a preponderance of the evidence that Collins killed Young. The nature of their relationship serves as a huge motivator for him to lie, conceal evidence and dispose of her body. Unlike a stranger assailant who is unknown and has no relationship with his victim, a domestic partner is a natural suspect because he has every reason to dispose of his victim's body. The evidence in this case points to Collins who had the motive, means and the exclusive opportunity to kill and dispose of Young's body. Text messages exchanged between the couple show the relationship was in trouble months *before* Collins assaulted and strangled Young on May 13. Collins' verbal and physical abuse, as witnessed by his daughter and by Neighbor #1, shows the interaction between the couple remained tense through May 15. Also, at the time she disappeared, he was secretly dating at least one other woman.

According to T-Mobile records, the last user-initiated activity on Young's cell phone occurred at approximately 4:39 p.m. before she arrived home. Since that time, all incoming calls to her phone, which has not been found, were routed to voicemail, which indicates the phone was powered off or was otherwise disabled.[23] The loss of cell service can provide the last known

---

the body;" and police checked local agencies and files and national crime database but could not locate victim);

*United States v. Overstreet*, 713 F.3d 627 (11th Cir. 2013) (affirming district court's finding at sentencing that defendant either killed his wife or "kidnapped her and left her for dead" and 420-month sentence on felon-in-possession charge even though her body was never recovered and he was not charged with her murder where defendant cut his electronic ankle bracelet, fled Texas, and his wife disappeared; he used her debit card 25 times in Florida, even though he must have known she would report the card stolen if she were alive; when he was arrested in Jacksonville, a gun and a roll of duct tape with his wife's blood were found in the trunk of the car; the two had been fighting shortly before her disappearance; she had reached out to her family for help; he had stolen her car, perhaps her guns, her cell phone, laptop, and her only means of support (a food stamp card and the debit card); and court found his demeanor and lack of emotion to cast doubt on his credibility).

[23] It is unlikely that her phone was disabled because the battery was dead. At least one cell phone charger was found in Young's car.

location of a missing person and possible areas to focus search efforts. Her phone last connected to a cell tower located 1.5 miles away from her home on Baby Road on May 15 from approximately 6:32 p.m. to 6:58 p.m., an indication that she was present at her residence. Young was last known to be alive, in good health and alone with Collins on May 15 inside their residence. There is no evidence that Young's phone nor Young left the residence after she arrived under her own power, in her car or otherwise. Yet she was not found in the residence, and she has not been seen or heard from since she arrived. Collins likely killed Young inside their home between approximately 4:52 p.m., when she entered the house, and 7:20 p.m. when Collins left the house to dump her car.[24] ADT registered no interior sensor activity inside the house from 7:20 p.m., while he was off dumping the car, until he returned. It is unlikely that she died of natural causes, and unlike two days before, there was no one present to intervene or call for emergency assistance to the residence. A person who dies naturally cannot dispose of her own body. *See People v. Manson*, 139 Cal. Rptr. 275, 298 (Ct. App. 1977) (The inability to find the victim's body "would justify an inference by the jury that death was caused by a criminal agency.")

Collins' attempt to deceive Young's family and police would lead any reasonable juror to doubt his claim that he had no role in Young's disappearance and death. It is well-settled that "an exculpatory statement made by a defendant and found to be untrue [can] be considered evidence of a consciousness of guilt." *United States v. Marfo*, 572 F. App'x 215, 231 (4th Cir. 2014) (unpublished) (quoting *United States v. McDougald,* 650 F.2d 532, 533 (4th Cir. 1981)).[25]

---

[24] At 5:24 p.m., Neighbor #3's camera caught him rummaging through the trunk of her car.

[25] Collins' behavior during police interviews *before* surveillance footage of him dumping Young's car was recovered also showed a consciousness of guilt. Officer Robinson BWC. He also took steps to appoint Iniesha as power of attorney over his affairs so that she would be okay "if things went left," i.e., took a turn for the worst. PSR, ¶ 55. Then on May 20-21, 2023, he sent the

23

Believing there was no video evidence of Young's presence at the residence and before anyone inquired about her whereabouts, Collins began staging her voluntary disappearance. He sent a 5:34 a.m. text message to Young's phone accusing her of not coming home Monday night because she had run off with another man. But Collins left his residence just after midnight Monday and according to him, his security cameras were unplugged, so how would he know whether Young had come home as he drove around Spartanburg, Greenville and Laurens counties? Collins continued this narrative when he lied to Springer, telling her that Young did not come home. When he did so, he surely knew that Young would tell a different story when she returned. But he also knew she was dead and *could not* return home. Falsely believing he had successfully deleted all the video images recorded by his camera on May 15, he lied again when he claimed that unplugging the camera wiped out all previously recorded video images. He did not anticipate that ADT records would prove his claim false and he did not anticipate that video footage of activity occurring on his property would be recovered from neighborhood cameras. Knowing that he had dumped Young's only means of transportation in the complex parking lot, he lied again when he told police that Young drove off from their residence in her car and that he did not leave his residence. Collins had to know that Young needed her car and that she would report it stolen when she could not find it. Again, he was not concerned about this eventuality because he knew Young *could not* search for her car. He had to know there was a chance he would be seen dumping the car just a few miles away. But it was a risk Collins believed worth taking to distance himself from any evidence that she was last known to be alive with him inside their home. He knew that tracking

---

following text messages to Iniesha's older sisters: "*I'm having a life changing event happen and [n]o matter what happens to me I love you and your sister untill end and forever. Reach out to your baby sister [Iniesha] as my last request…*" and "*Thank you for reaching out to your sister…she needs support from everyone at this time.*"

Young's phone would show that cell tower connectivity permanently ceased while she was alone with him inside their residence. This is not the first time a person who causes a death—due to negligence, accident, or murder—has tried to create an illusion of time and proximity from the victim's last-known whereabouts and the act by trying to establish an alibi, obstruct justice, or otherwise attempt to avoid detection. But for the tipster who spotted the car in the parking lot and surveillance cameras that saw Collins himself wiping it down and dumping it, his narrative that Young abandoned her life to run away with a new boyfriend would be the only story ever told. The evidence establishes by more than a preponderance that Collins killed Young.

**B.      Analysis of the § 3553(a) factors supports an upward variance.**

When imposing a sentence, 18 U.S.C. § 3553(a) requires a district court to consider various factors including the nature and circumstances of the defendant's offense and the defendant's history and characteristics; the need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense, to afford adequate deterrence to criminal conduct, and to protect the public from further crimes of the defendant; the kinds of sentences available; the applicable guidelines range; and the need to avoid unwarranted sentencing disparities. *See* 18 U.S.C. § 3553(a)(1)-(6). Sentencing courts have "*extremely broad* discretion when determining the weight to be given to each of the § 3553(a) factors." *United States v. Jeffery*, 631 F.3d 669, 679 (4th Cir. 2011) (emphasis added) and the fact that a "variance sentence deviates," even "significantly," from the Guidelines range "does not alone render it presumptively unreasonable," *United States v. Rivera-Santana*, 668 F.3d 95, 106 (4th Cir. 2012); *see also United States v. Hampton,* 441 F.3d 284, 287 (4th Cir. 2006) ("If the district court's justifications for the variance sentence are tied to § 3553(a) and are plausible, we will uphold the sentence as reasonable." (internal quotations omitted)).

25

The recommended Guidelines sentence—37 to 46 months—only considers Collins' obstructive and misleading conduct. It does not reflect the purpose and magnitude of his conduct, that is, to avoid responsibility for his role in Young's disappearance and death. As briefed in the Government's objections to the PSR, that range improperly awards Collins credit for accepting responsibility and rewards him for having no criminal history.

Throughout the investigation, specifically during his May 16 police interview, Collins continued to deny that he assaulted and strangled Young. Obviously, the circumstances surrounding the domestic incident that occurred two days before Young disappeared were part of the kidnapping investigation. His continuing attempts to conceal that he assaulted and strangled her constitutes relevant conduct for the witness tampering and obstruction of justice offenses. If the defendant continues to deny that he assaulted and strangled Young, then he falsely denies relevant conduct., which is inconsistent with acceptance of responsibility and would support denial of the acceptance-of-responsibility reduction under § 3E1.1 cmt. n. 1(A). *See* USSG § 1B1.3(a)(1) (relevant conduct includes "all acts and omissions committed … by the defendant ... that occurred during the commission of the offense of conviction, in preparation for that offense, or in the course of attempting to avoid detection or responsibility for that offense"). Further, based on the May 13 domestic violence incident and the fact that he subsequently took Young's life, Collins does not qualify for a two-level zero-point offender reduction under USSG § 4C1.1(a)(3)-(4), which precludes a reduction where the defendant used "violence or credible threats of violence in connection with the offense" or where the offense "result[ed] in death or serious bodily injury." Sustaining these two of the Government's objections would yield a Guidelines range of 63-78 months.

If the Court sustains the Government's additional objection to the PSR and finds the defendant obstructed a death investigation—not merely a kidnapping investigation—application of the second-degree murder cross reference under USSG § 2A1.2 would cap the base offense level at 30 pursuant to § 2J1.2(c)(1) and § 2X3.1(3)(A), yielding a Guidelines range of 97-121 months.[26] A reduction for acceptance of responsibility results in total offense level 27 and an advisory range of 70-87 months. An additional reduction under USSG § 4C1.1(a) (Zero Point Offender) would reduce the total offense level to 25, resulting in a sentencing range of 57-71 months.

Regardless of the guidelines ultimately applied, multiple § 3553(a) factors support an upward variance to 240 months' imprisonment in this case. *United States v. Parral-Dominguez*, 794 F.3d 440, 447 (4th Cir. 2015).

### 1. The nature and circumstances of the offenses are not adequately covered by the Guidelines.

Collins did not commit his crimes in a vacuum. As part of its analysis of the § 3553(a) sentencing factors and to arrive at a sentence that reflects the seriousness of his offenses, the court should consider his role in Young's murder. *United States v. Fernandez*, 581 F. App'x 221, 223 (4th Cir. 2014) (citing *Overstreet*, 713 F.3d at 637) (In affirming the district court's upward variance from 180-188 months to 420 months' imprisonment (123% increase) under the

---

[26] While first degree murder "requires a showing of premeditation" and "malice aforethought," second degree murder requires only a showing of malice aforethought. *United States v. Williams*, 342 F.3d 350, 356 (4th Cir. 2003). Malice aforethought can be established "from the whole facts and circumstances of the killing." *Id*. (citation omitted). The Government need not "show an intent to kill or injure." *Id*. "Rather, malice aforethought 'may be established by evidence of conduct which is 'reckless and wanton and a gross deviation from a reasonable standard of care, of such nature that a jury is warranted in inferring that defendant was aware of a serious risk of death or serious bodily harm.'" *Id*. (citation omitted).

ACCA, "[t]he fact that [the defendant] killed his wife in the process of absconding from parole [wa]s directly germane to several § 3553(a) factors," including the need for the sentence to promote respect for the law, afford adequate deterrence, and protect the public from future crimes of the defendant.).[27]

Congress could not have conceived of a purpose to commit witness tampering and obstruction of justice more egregious than doing so to evade responsibility for intentionally killing another person. And when you consider that Congress thought the worst-case scenario for each offense was worth 20 years, the only question is whether a lesser sentence is sufficient here.[28] *E.g.,* 21 U.S.C. § 841(b)(1)(C) (prescribing a 20-year mandatory minimum for generally unintentional, even if foreseeable, drug distribution resulting in death).

Even if the evidence is not sufficient to find that Collins killed Young, his obstructive

---

[27] *See also United States v. Waller*, 689 F.3d 947, 958, 960 (8th Cir. 2012) (affirming variance from 10-16 months to statutory maximum 60 months under 18 U.S.C. § 875(c) for transmission of a threat based on finding that defendant murdered his wife in a "no body" homicide case where defendant repeatedly threatened to kill his wife, who vanished four days after telling him she was in a relationship with another man and shortly thereafter met him to sign divorce papers; defendant was the last person to see her alive; shortly after she went into his residence, he did not answer his sister-in-law's phone calls, until she left him a message saying that if she did not receive a response within ten minutes, she was going to call the police; he initially lied to his sister-in-law by denying that his wife had been at his residence; later, he told police that she had been "napping" at his residence, he had thrown her keys into a tree, and she had left on foot; in interview with authorities, he did not mention her being injured at his residence, but authorities found spatters of her blood on the walls and pieces of carpet hidden in the crawl space of his basement with her blood on them; he later admitted cutting up the carpet and hiding it, saying he did not want his landlord to find out and "think that something happened"; and his father said he admitted that he killed and buried her).

[28] In *United States v. Vause*, Criminal No. 2:24-0234-RMG, the defendant pled guilty to three counts of lying to a federal officer regarding her role in the victim's abduction, sexual assault and murder. Each count carried a maximum sentence of eight years pursuant to 18 U.S.C. §1001(a)(3). After an analysis of the § 3553(a) sentencing factors and to address extent of the defendant's conduct, the court stacked the statutory maximum for each count to reach its chosen sentence of 18 years imprisonment.

conduct is inextricably intertwined with a death investigation. His actions are sufficient to distinguish this case from the heartland of obstruction offenses and warrant an upward variance. *United States v. Bollinger*, 798 F.3d 201, 221 (4th Cir. 2015) ("A fact that is taken into account in computing a Guidelines range is not excluded from consideration when determining whether the Guideline sentence adequately serves the four purposes of § 3553(a)(2).").[29]

Aside from the serious nature of the underlying conduct, the extent of Collins' obstruction independently warrants an upward variance. His attempts to cover up his conduct was not a spontaneous act. No one questioned him about Young until the day after she disappeared. He had time to consider reporting the incident honestly. Instead, the defendant took numerous deliberate and well-considered steps to derail the investigation of Young's disappearance and death. The application of USSG § 2J1.2(b)(2) and (3) would have been supported by a single discrete instance of deliberate dishonesty or concealment and destruction of evidence. Any one of the following acts

---

[29] *See also United States v. Waters*, 281 F. App'x 152, 156-58 (4th Cir. 2008) (unpublished) (although obstructive conduct was accounted for in the Guidelines, upward variance in a gang-related prosecution was reasonable; court was not precluded from considering "the cavalier method" in which Waters planned to have the witness against him killed, given extent of defendant's actions as reflected in district court's repeated refrain, "there is obstruction of justice and there is *obstruction* of justice," in concluding that the enhancement provided by the Guidelines failed to capture the gravity and flagrancy of defendant's conduct);

*United States v. Miller*, 479 F.3d 984, 987-88 (8th Cir. 2007) (affirming upward variance from 18-24 months to statutory maximum 60 months for perjury offense based on exceptional circumstances where defendant falsely testified she had no knowledge of the disposal of murder victim's body; perjury "impede[d] the administration of justice," resulting in the dissipation of evidence; defendant's "lies prolonged the suffering and the anguish of the victim's family who had been seeking answers about the victim's death and the location of his body so he could be properly buried;" and, even though defendant did not directly participate in murdering the victim, her role in disposing the body by draining and dismembering it (for which she had not been punished) made it more difficult to detect and resolve violent crime, supporting finding that "[n]o one could engage in the type of conduct that she engaged in without posing a serious risk to the public").

by Collins would have sufficed: (1) falsely denying that he strangled or attempted to strangle Young and lying about the availability of video camera footage to prevent their discovery; (2) dumping and wiping down her car and its contents in a location and manner to avoid detection; (3) planting a phony text message to Young to make it appear she disappeared voluntarily; (4) lying to Springer by telling her that Young did not come home after work; (5) pausing his camera's recording function and deleting recorded video images to prevent discovery of evidence of her whereabouts; (6) lying to police by telling them that Young drove off in her car, causing them to search for a car he knew was not in her possession; (7) lying to police by telling them that he did not leave his house; (8) purposely leaving his cell phone at home while he dumped the car to create a false record concerning his whereabouts; (9) powering his cell phone off to intentionally prevent the collection of location data during his midnight drive; and (10) disabling and disposing of Young's phone which prevented the recovery of location data. A within-Guidelines sentence would give Collins a free pass on his multiple acts of obstruction and incentivize defendants who, having once obstructed justice in the commission of the offense of conviction, make additional attempts, secure in the knowledge that doing so cannot make his situation any worse, and possibly improve his chances of avoiding responsibility.

### 2. The defendant's history and characteristics support an upward variance.

#### a. Criminal history

An upward variance to adequately reflect the defendant's criminal history is rooted in the need for the sentence to protect the public, promote respect for the law and deter future similar conduct under § 3553(a). In addition to his May 2023 domestic violence offense, Collins committed similar offenses in 2006, 2015 and 2018, while he was active duty in the U.S. Army. Enlisted military offenders may be prosecuted in civilian courts but may also be subject to

30

administrative measures within the military justice system under the *Uniform Code of Military Justice* (UCMJ). The authority to prosecute or refer charges to court martial are within the purview of the command level, by individuals with direct authority over the servicemember. The charges filed against Collins were disposed of after he completed a diversion program and, as active-duty serviceman, under the UCMJ. Therefore, Criminal History Category I under-represents his conduct.

However, uncharged and dismissed offenses are appropriate for the court's consideration in imposing sentence. 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense… which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence."); *see also United States v. Walker*, 112 F.3d 163, 165-166 (4th Cir. 1997) (affirmed upward departure under USSG § 4A1.3 based on prior illegal conduct for which the defendant, an attorney, was disbarred but never convicted). The U.S. Army Criminal Investigations Command (CID) reports document the uncharged acts of violence in the defendant's criminal history:

- <u>Pierce County Sheriff's Office, Parkland, Washington</u>: On February 24, 2006, at 5:21 p.m., Deputy Centoni was dispatched to the parking lot of a local business in response to a domestic assault report. When the deputy arrived, he was met by a woman (Victim-1) and Collins' two roommates, who were eyewitnesses to the incident. Centoni reported that Victim-1 had tears in her eyes and was slightly favoring her neck and back. The left side of her neck appeared a little red and there were slight (finger type) marks on the left side of her throat. Victim-1 reported that she and Collins, stationed at Fort Lewis, had been dating off and on for seven years. Victim-1 stated that on February 24, 2006, Collins told her that he did not want to marry her. Victim-1 reported that when she accused him of cheating on her, Collins became angry, grabbed her neck and began choking her which made it hard for her to breath. Collins slammed Victim-1 onto the kitchen counter and then threw her on the floor. The two eyewitnesses heard Victim-1 screaming and a loud "thump" in the kitchen. When they ran into the kitchen, they saw Collins standing over Victim-1 as she laid on the floor. The male roommate restrained Collins to prevent a further assault. As the other roommate pulled Victim-1 away, she observed Collins kick Victim-1 in the face. He was arrested and charged with fourth degree domestic violence assault and transported to jail. Collins completed a civilian two-year diversionary program, paid a fine and the case

was dismissed. PSR, ¶ 70. Under the UMCJ, the allegations were determined "founded" and disposed of administratively.[30] Collins did not appeal the CID determination.

☐ <u>Military Police Battalion, Fort Drum, New York</u>:  On April 1, 2015, military police were dispatched in response to a verbal altercation between Collins and Victim-2, another non-commissioned officer. The investigation determined that Collins threatened to shoot Victim-2 with what appeared to be a firearm camouflaged in a shirt, specifically, Collins angrily told Victim-2, "I'm going to fill you with seven rounds!" Collins was charged with communicating a threat, in violation of Article 134 of the UCMJ. The allegations were determined "founded" and disposed of administratively. PSR, ¶ 71. Collins did not appeal the CID determination.

☐ <u>U.S. Army Garrison Bavaria, Grafenwöhr, Germany</u>:  On July 27, 2018, Victim-3, who was Collins' then-wife, reported that he "grabbed her by her arms and slammed her against the wall" leaving her arms black and blue. Victim-3 also reported that Collins harassed her and violated military protective orders at least three times: in February 2018, on April 21, 2018, and on May 7, 2018. While awaiting approval for the early return of a civilian dependent ("EROD") (a mechanism for returning civilian or military dependents to travel to the continental United States prior to termination of soldier's overseas tour due to official or personal situations), Victim-3 applied for and received extended protection orders. Collins was charged with four counts of assault consummated by battery, in violation of UCMJ Article 128b. PSR, ¶ 72. The allegations were determined "founded" and disposed of administratively. Collins did not appeal the CID determination.

Collins retired from the military in 2020. As documented by witnesses and by police body-worn camera, his abusive conduct continued at least to May 13, 2023. PSR, ¶¶ 7-12. He cannot credibly argue that he continually finds himself falsely accused of domestic violence. Collins bragged to the cooperating witness that, thanks to his military experience, Young's body would never be found. Instead of using his military training to defend his country, he's using it to—literally—try to get away with murder.

---

[30] "Founded" is defined as a determination by the CID that a criminal offense enumerated in the UCMJ, Federal Criminal Code, or a state statute has been committed. The determination that a founded offense exists is an investigative decision based on credible information and not dependent on a judicial decision. U.S. ARMY CRIMINAL INVESTIGATION COMMAND, REG. 195-1, CRIMINAL INVESTIGATION OPERATION PROCEDURES, para. 7-25c(1) (2014).

The nature of the defendant's prior dismissed and uncharged conduct warrants an upward variance to a sentence that adequately addresses his criminal history and the likelihood of recidivism. *United States v. Grubbs*, 585 F.3d 793, 803–04 (4th Cir. 2009) (finding variance from 151-188 months to 240 months reasonable based on finding that defendant convicted of multiple violations of interstate transportation of minors for the purpose of engaging in sexual activity, had uncharged additional incidents of abuse against victims not identified in the offenses of conviction and at least a 20-year history of molesting school boys, and that he engaged in the "continued predatory conduct" of abusing one child victim after he was under investigation for abuse).

In many cases, a defendant's lack of criminal convictions is a primary source of mitigation. Collins' lack of criminal convictions is largely due to his status as a servicemember, during which he avoided criminal prosecution in civilian courts. His lack of criminal convictions was one reason he was not arrested for assaulting and strangling Young. *See* PSR, ¶ 12. Given the similarities between military misconduct and the conduct in this case, his lack of criminal convictions is outweighed by his escalating history of violence and the leniency afforded him in the past. *United States v. Rivera-Santana*, 668 F.3d 95, 105 (4th Cir. 2012) ("… it was well within the court's discretion to accord more weight to the host of aggravating factors and decide that the sentence imposed would serve the § 3553 factors, on a whole."). Comparable deviations based on these factors producing sentences longer than the 240-month sentence requested in this case have been upheld as substantively reasonable. *See e.g.*, *United States v. Myers,* 589 F.3d 117, 126 (4th Cir.), *cert. denied,* 130 S. Ct. 3306 (2010) (affirming upward departure from 121 months to 360 months under § 4A1.3 based on criminal history, including unscored convictions and recidivism; sentence predicated on that departure would satisfy § 3553(a) sentencing factors); *United States v.*

*Lawrence*, 349 F.3d 724, 727 (4th Cir. 2003) (affirming upward departure from 96 to 262 months based in part on a defendant's "extensive juvenile record").

      **b. The need for the sentence to protect the public from further crimes.**

Protection of the public from further crimes of the defendant as called for under § 3553 (a)(1)(C) should also be of paramount concern in this case. His chosen method of abuse—strangulation—is widely recognized as one of the most lethal forms of domestic violence. It is extremely dangerous: because it restricts the victim's breathing and circulation of the blood, a victim can lose consciousness within 5-10 seconds and die within minutes.[31] *See* Training Institute on Strangulation Prevention, *Strangulation in Intimate Partner Violence Fact Sheet* (2017) (available at https://www.familyjusticecenter.org/resources/strangulation-intimate-partner-violence-fact-sheet/). Strangulation is one of the best predictors for the subsequent homicide of victims of domestic violence. One study showed that the odds of becoming an attempted homicide victim increased by 700 percent, and the odds of becoming a homicide victim increased by 800 percent for women who had been strangled by their partner.[32] The consequences of any additional leniency Collins is afforded will likely fall on his future victims.

---

[31] Forty-nine states have toughened laws against strangulation by making it a standalone felony offense or a means of criminalizing strangulation as a felony offense. In South Carolina, non-fatal strangulation can enhance a domestic violence offense and form assault or battery, but it is not a standalone felony. *See* https:// www.strangulationtraininginstitute.com/resources/legislation-map.

The Violence Against Women Reauthorization Act of 2013 ("VAWA") amended the federal assault statute to criminalize "[a]ssault of a spouse, intimate partner, or dating partner by strangling, suffocating, or attempting to strangle or suffocate." 18 U.S.C. § 113(a)(8).

And effective January 1, 2019, the UCMJ was amended to add a specific punitive article for domestic violence—Article 128b. The amendment requires a threat or violent offense or the specific act of strangulation or suffocation to trigger the UCMJ. Article 128b, UCMJ.

[32] Nancy Glass et al., *Non-Fatal Strangulation Is an Important Risk Factor for Homicide of Women*, Journal of Emergency Medicine 35(3) (2008).

There has been no expression of remorse nor acknowledgement of any wrongdoing prior to or after Collins pled guilty. His lack of remorse demonstrates a heightened need to "deter future criminal conduct by this defendant" and instill "proper respect for the law." *See* § 3553 (a)(2)(A)-B. A significant period of incarceration may be one of the few effective tools available to deter such conduct. *See* 18 U.S.C. §3553(a)(2)(B).

Finally, there is no reason to believe that a 240-month sentence on these facts will lead to unwarranted sentence disparities among "defendants with similar records who have been found guilty of similar conduct."[33] § 3553(a)(6). The national average for obstruction-related offenses for 2019-2023 according to Sentencing Commission data alone will not negate the district court's consideration and application of the § 3553(a) factors. *See* 18 U.S.C. 3553(a)(6). Averages of sentences that provide no details are unreliable to determine unwarranted disparity because they do not reflect the enhancements or adjustments that distinguish individual cases. Even if a sentence "is more severe than average, that fact does not mean it was unwarranted." *Rivera-Santana*, 668 F.3d at 106. The facts of this case warrant a significant upward variance.

## CONCLUSION

The Court should impose a sentence that reflects an upward variance based upon the §

---

[33] The requested variance is far from extreme under Fourth Circuit precedent. *See, e.g.*, *United States v. Blake*, 565 F. App'x 241, 245 (4th Cir. 2014) (unpublished) (affirming variance from 121-151 months to 240 months for conspiracy to commit murder and kidnapping in aid of racketeering and aggravated reentry based on § 3553(a) factors, including the need to not trivialize defendant's conduct and foster societal cynicism following the grant of a ten-level government departure motion); *United States v. Howard*, 743 F. App'x 526, 527 (4th Cir. 2018) (unpublished) (defendant's likelihood of reoffending, pattern of violent behavior toward others, which were not part of instant drug conspiracy, justified 96-month variance sentence, *more than four times* the high end of the 15-to-21-month range); *United States v. Mayhew*, 715 F. App'x 232, 234 (4th Cir. 2017) (unpublished) (affirming departure and variance from 108-135 months to 320 months for fraud based on underrepresented criminal history, dismissed or uncharged conduct, and the "likelihood that the defendant will commit other crimes, the nature and circumstances of the instant offense, and the history and characteristics of the defendant" pursuant to § 3553(a)).

3553(a) sentencing factors, as specified in § 3553(b)(1), from the current advisory range to 240 months' imprisonment—a sentence sufficient but not greater than necessary to accomplish the goals of sentencing.

Respectfully submitted,

BRYAN P. STIRLING
UNITED STATES ATTORNEY

BY:     */s/Leesa Washington*
        LEESA WASHINGTON (FED ID 06973)
        Assistant United States Attorney
        55 Beattie Place, Suite 700
        Greenville, South Carolina 29601
        Tel: (864) 282-2100
        Email: Leesa.Washington@usdoj.gov

May 13, 2025